I don't know where it goes. No, I'm focused on one thing. Is that everybody, Matt? Okay. Alright, so the court has consolidated for argument our final three cases of today. Ben Hotel Development against Cincinnati Insurance, which is 21-1559, and Sandy Point Dental against Cincinnati Insurance, 21-1186, and TJBC against Cincinnati Insurance, 21-1203. So the parties have allocated their time as we gave them permission to do, and my records show that we begin with Mr. Lubin. Is that correct? Your Honor, this is Mr. Barnes. We decided I'm going to go first today, if that's okay. It's perfectly all right. That's fine. Judge, I'm always happy to play second fiddle, but yes, that's true. Mr. Barnes is going first. Alright, very good. So you may proceed, Mr. Barnes. Thank you, Your Honor. May it please the court. Jay Barnes on behalf of the Main Street Brewing Company. This case presents a little bit different questions. There are two policy coverages in issue. One is a general coverage. The second is civil authority coverage. The first difference between the other cases is that a covered cause of loss under this policy is defined to include not just direct physical loss, but risks of physical loss. And so even the risk is enough to trigger coverage here. The other issues, though, there are some similarities here, of course, because the policy covers loss or damage under the general coverage, and we meet both requirements. Judge Wood, you asked earlier if the, in the fencing example, wouldn't that be a functional loss? And your question is entirely consistent with what Cincinnati argued was the definition of loss in the case of advanced cable, which this diminution of value or functionality. That's consistent with every dictionary definition of the word loss, and it's entirely consistent with what happened here. Functional loss. Let me give you some data points about my client. In April of 2019, my client's restaurant, which serves over 300 people a night, many nights, had $200,000 in revenue. In April 2020, immediately after the orders, it had $32.32. They also operate a banquet hall, which was completely banned from operating because of the 50-person limit. It had $0 in income in April 2020. They also operate a tap house, which is a very, was a very crowded location. It had $0 in revenue in April of 2020, and the same generally was true as we went through the crisis. I would also note that COVID is physical. Your Honor asked a question about electricity, which was intangible. COVID is a little bit different than electricity. It has an actual physical existence, and that physical existence can cause loss or damage. You can see it in a microscope. Just because you can't see it with your eyes doesn't mean you can't see it overall. Would that then be a damage to the building? It would be a damage to the building. This policy, Judge, is broader than that, though, because it states that it covers the premises, and the premises is defined as the address, which is more than just the building itself. In Illinois law, Your Honor, I want to go to damages questions. When you say more, can I just interrupt you? Can you say more, do you mean that premises means it includes the air inside the building, or what are we adding in? It would include the air in the building in the policy. It's everything at the address, and I think that Illinois law is clear in the asbestos coverage cases, where you have the presence of a life-threatening particle that triggers coverage under loss or damage. But they distinguish the asbestos cases by saying that the only way to remediate the asbestos, if it's become friable, is essentially to rip the building apart, whereas with the virus, if you go in there with some bleach or something of the sort, there are all kinds of substances that the EPA and CDC say are safe, and you just wipe it up, and you kill the virus. That's a great question, Your Honor. That's a fact question, and we disagree with that, because if you look at how hospitals treated COVID patients, they didn't just say, hey, this COVID patient can go in this room next to a non-COVID patient, because we'll wipe down the surfaces. They have to, to make the facilities safe, have to introduce negative airflow systems. Those negative airflow systems are too expensive for a restaurant to do. So instead, and we didn't plead this because we didn't think we needed to, and we didn't get leave to amend, our client actually changed the physical structure of its property. There's an Illinois case called Elko Industries Incorporated versus Liberty Mutual, which we cited, which found that the replacement process, removing certain things that damages certain portions of the finished product, that is damage in and of itself. So our client did that thing. We should be allowed to go back and do it. But in addition to that, there's damage under Illinois law under these asbestos cases. There's another case called U.S. Gypsum Co. v. Admiral Insurance Company, where it said Illinois courts are free to consider the risk of fibers that have not yet been released, which are worse certain to be released based on repeated activities and conduct. And that exactly is what would happen here. I want to jump real quick to civil authority coverage because I'm going to cover it later. Cincinnati has two defenses to this. The first is that there was no fiscal loss to other property. Your Honors touched upon it earlier with the governor's order. The governor specifically found that there was damage to property caused by COVID. And there is no geographical limitation on the civil authority coverage in this case. And then the second thing they said is, well, it's not completely prohibited. But that's not what the policy says. That policy says that it must prohibit access. It doesn't say whether it prohibits all access, some access, a little bit of access. It just says prohibits access. And under the rule that any ambiguity goes to the insured, we must prevail. I'm really nervous about my clock. I see the clock in the corner. I'm afraid I'm, am I jumping into Mr. Lubin? You are in your rebuttal time. So if you want to yield to Mr. Lubin, maybe you should do that. I will yield to Mr. Lubin. All right. Your Honors, what I'd like to cover at some point is the exclusion that exists. And by the way, please, the court and counsel is a bizarre thing for me to go in the middle of someone else's argument. I've never done that before. Thank you very much for hearing this case. At some point, I'd like to discuss the virus exclusion, which doesn't exist here and which has existed in all the other cases that we've discussed. But I did want to answer one of your Honor's questions. Elger, the 2001 decision that everyone's been citing, and really more than us, it's been the insurance companies that have been citing Elger because it's so good for them. But look at the language in Elger. We conclude that to the average ordinary person, tangible property suffers a physical injury when the property is altered in appearance, shape, color, or any other material dimension. That's fine. I understand why they cite that language. It's great for them. Then comes the next sentence. Conversely, to the average mind, tangible property does not experience physical injury if that property suffers intangible damage such as diminution in value as a result of failure of a component such as the quest system to function as promised. On one side, you have changes in color, shape, material dimensions. On the other side, you have diminution in value. We certainly fall between those two things. We're not talking about diminution in value. We're talking about the fact that my client, in this case, a dentist's office and a hotel and counsel's client, a bar, weren't allowed to service their clients and therefore weren't able to make money. Not because the building had a diminution in value, but because people weren't allowed to go into the building. If they went into the building, whether they were allowed to or not, they certainly weren't going into the building because of the fact that doing that would be dangerous. Then we turn to the asbestos cases, which are so helpful in underlining what exactly we're talking about when we say physical loss. In Elger, what's the difference between this and asbestos? They answered that question. We specifically explained that the property was physically injured as a result of the presence of toxic asbestos fibers within the structures as the building and their contents, carpets, upholstery, drapes, et cetera, are virtually contaminated or impregnated with asbestos fibers, the presence of which poses a serious health hazard to the human occupants. So, Mr. Lubin, let me ask you this. Let's not worry about the surfaces for the time being, since I think that's a weaker point for you. But this virus is, in fact, we know, communicated by aerosolized particles. People sneeze. People breathe. People sing. People do whatever they do. But there's nothing unique about any of these premises. The same thing is true outside. The same thing is true in every building in the world, basically. There's nothing unique about even the United States. So I'm concerned about that breadth of coverage. There's nothing that distinguishes your premises from anything else. Judge, it's a fabulous question. And the answer is that if you look at the policy, there's nothing in the policy that says the damage here has to be unique. It just has to be physical. And what we're talking about is whenever we're talking about an insurance policy, we're always talking about a balancing of interests. As a consumer, I purchase an all-risk policy because I want to make sure that any risk, even risks that I can't imagine, are going to be covered. And it's up to the insurance company to then say, well, we want to exclude certain risks if they think those risks should be excluded. So the answer is that this is a terrible, unfortunate situation that affected every single person in the world. And that's certainly unfair to every single person in the world. But when we're talking about the balancing of interests here, it was the insurance company's role to exclude this injury, this risk, if they thought that they should do so. And Judge, to that point, the insurance industry did say, hey, after SARS, maybe we should exclude this risk because it's out there and it otherwise may be included. And I understand their rejoinder. I understand that the defense has said you don't look at the exclusions to determine what's included. But there also is a context in which that exclusion has to be considered. The context is that the insurance industry looked at their policies and they said, boy, we have a problem here. After SARS, it's clear that these policies may cover injury due to virus. What if people can't go to a bar because of a virus? Now we're going to have to cover all these bars. We've got to do something about that. And they did, except they didn't do it in this policy. They recognized the problem. They fixed it in some policies. They didn't fix it in other policies. And this is one of the policies where they didn't fix it. As to the question about the air, this court and other courts have found in many cases that damage to the air, which affects the physical usability of the property, not diminishing in value, but the physical usability of the property is covered. Odor, Essex Insurance Risk Bloom South, which I quoted in my brief, it's a First Circuit decision. The ammonia discharge was physical damage because it made a facility unusable. It doesn't make it permanently unusable, but it makes it unusable until we deal with that. Gas build-up under a church, that doesn't change the structure of the building, but it does make the building unusable. And that's what happened here, Your Honors. I see my time is about over. Thank you so much. All right. Thank you. And we have two minutes from Amicus Curiae, Mr. Gillette. How were you pronounced? Yes, Your Honor. May it please the court, Gabriel Gillette from Jenner and Block, appearing on behalf of Amici, the Restaurant Law Center, and the Illinois Restaurant Association. In light of all the arguments this court has heard today, I want to make just two points. First, the policy interpretation principles at issue here are well-established, and they support the appellants. These are all risk policies. They provide coverage for all risks unless specifically excluded. Coverage is construed broadly, and exclusions are construed narrowly. There's no federal common law of insurance here. Under Erie, what matters is how state Supreme Courts view these issues. And what state Supreme Courts say, like Illinois, is that undefined terms, like physical loss or damage, have the meaning that ordinary, reasonable consumers would ascribe to them. It's not about the gloss that comes from an insurance treatise or coverage lawyers or even judges. The point is, what would an ordinary consumer think when they purchase this policy? To ordinary people, physical loss or damage doesn't mean complete and total destruction. It doesn't mean permanent dispossession. What it means is physical loss or damage to the building. Physical loss or damage to the insured property, Your Honor, and the insured property here. The insured property would be a building, isn't it? It's not everything else. That's what I'm trying to focus on, because that, to me, looks like what the real target is, physical damage to the building. Your Honor, but this also includes physical loss. And I think what this sort of points up, Well, that's unlimited. It's not limited, Your Honor. It's constrained by the language of the policies and the allegations and the complaint. And I think that's the other point I want to stress. These cases are different based on the allegations and the complaint of physical loss or damage. Some say the property was visibly, physically altered. Some say they lost function. Some say the air was damaged. The point is that this court, as it looks at these issues, needs to consider the actual allegations and the complaint, along with the policy interpretation principles that I just discussed. Thank you very much. Thank you. We will now turn to Mr. Litchfield for the testimony. Very embarrassing. I apologize. At this point in the pandemic, not a mistake I should make. If the Court please. This case, I think, has been recognized to be about loss of revenue caused by government regulations, not tied to physical loss or damage to the properties of these three appellants. And it's pretty common in our regulated economy to have loss of financial gain due to government regulation. TJBC couldn't seat the people it wanted to for a short period of time in its dining room, but it was allowed by the order to do takeout and delivery. Sandy Point couldn't do all the procedures that it was capable of doing for a short period of time, but it alleges that, and the order from the Governor stated that it could do emergency procedures, and there's no reason to believe that it didn't. Bend Hotel was considered to be an essential business, and just says that it couldn't do all the things that it would ordinarily do as a hotel, but was open as a hotel, then alleged that it wasn't, and could have been if it was. The Governor's orders are what we need to look at, not the characterizations of those that we've heard discussed a few times, and I'd like to weigh in on that a little bit. And this leads then to the issue of temporary versus permanent dispossession of the property. Starting with the fence, we have to look at cause versus effect. The policy says that business direct physical loss or damage to the property then is required to have caused a suspension in the operations. That suspension in operations then is covered for the duration of what's defined as the period of restoration, which ends when the property is repaired, rebuilt, or replaced. And it's during that period of restoration, if it's triggered by the other previous things in that timeline, that the coverage is supplied. This isn't a separate kind of additional coverage supplied in a property policy. The core coverage in the property policy is for direct physical loss or damage to covered property, which is essentially the building, can include a personal property, and that's all well defined up front in the policy. Well, let's go just to the damage to the building, to the facility. That seems to be the issue here. And if we get into everything else, whatever the, whatever's going on a lot with other, what is it, the coronavirus, we have all kinds of things that are injected into that. Because it seemed to me the one policy that I was focused on was damage to the building, and not all kinds of loss of income that come from lots of other problems. And Judge, you're right. These are commercial property policies, and they focus on damage to the building. They supply a separate additional coverage for business income in situations where there is damage to the building. It's an extra kind of coverage, but it's tied to the concept of direct physical loss or damage to the building. Now, none of these people, none of these apollons have made a claim for the repair, rebuilding, or replacement of their buildings, all right? Right. So we have, for example, you know, this is in the Bend Hotel brief, the business income section of that policy will pay for actual loss of business income, I'm jumping over, if the suspension is caused by direct loss to the property at a premises caused by a covered cause. So yes, there's more paid than just the damage to the building, but that's because of these additional endorsements, I think. Judge, that's correct. And my point is that we is part of, which is a commercial property policy. And that was the core of my response to Judge Mannion. So we're talking about temporary versus permanent. There is a coverage, and it's in play in a couple of these cases, I think, called civil authority that is designed to deal with a temporary loss of access, prohibition of access to the premises. Your Honor gave a classic example of where that coverage would often apply, and that's the tornado that deposits rubble on the premises of the hotel, but the tornado somehow miraculously missed the hotel. Well, what happens in those circumstances is roads are closed, the police set up barricades, access is denied because it is not safe for people to try to pick their way through that rubble in order to get to the hotel until it's cleaned up by the government, typically, as a part of the response to the storm. Now, the tornado is a classic example of direct physical loss or damage to somebody's building. That's where the rubble came from. Can I ask you my hypothetical, Mr. Litchfield? Yes, sir. The owners or the managers talk their way in. There's something we really, you know, we'll do it on our risk. We really need to get inside to make sure X is functioning or to retrieve some property that's especially valuable in the safe or something like that. One or two people are allowed in. Does that defeat coverage? I have to break it down a little bit, Judge, because there's really two moving parts to that. If they talk their way in, meaning that they're violating the civil authority order prohibiting access and they just... The people enforcing the order let them in? Yeah, so then I guess if the people enforcing it let them in, one would not say that there was a prohibition of access as to those two people at that time. You would deny coverage? No, I think we'd take a good hard look at a situation where there's not a prohibition of access. The key here is that there was no prohibition of access. It wasn't just two people allowed in. It was everybody was allowed in except they couldn't sit in the dining room. They could still come in. Can I ask you another question? The language here in the policy covers risks of various kinds of physical damage and obviously storms and fires are the quintessential examples. So I understand, does the policy apply for example if because there's a, let's say, a wildfire threatening the town, there's an evacuation order but the fire winds up missing the town, doesn't cause physical damage to the property, but the hotel is closed for two weeks while people are putting out the fire. Is that is that a risk of a covered loss? Well, we have to, again, a couple of moving pieces if so I can be true to the policy. First of all, the risks of physical loss mean if you break down the meaning of the word loss, which is a defined term, it really says risks of direct physical loss or damage. That's the first point about covered cause of loss. Second, in your hypothetical, if the government has issued an order prohibiting access to the town, there's clearly damage to the trees that are burning outside of town and yes, that would be a candidate for the civil authority coverage, which is a temporary type of coverage. Suppose there's no order, was just sensible people get out of town. Judge the way the coverage is written, it says there has to be an order of a civil authority. I'm talking about the risk of a physical loss or damage, physical damage to the building winds up interrupting business. But the business income coverage still requires that there be direct physical loss or damage to property at the premises. So there are two different working pieces here. There's the and the question is, does the word risk, I think what you're positing is, does risk refer to threat or does it refer to a type of exposure? I think it's the latter. But more importantly, we can put that aside for a moment and focus on the language in the provision that we're discussing here today, which is the business income provision. And that says there has to be direct physical loss or damage to property at the premises. We're back to where we were a moment ago with Judge Mannion, that we need to see direct physical loss or damage to this building and the contents in the building, which are also covered. And that's what it says. So if we go back to Illinois law, as described by this court and by the only Supreme Court, we have to look at what the words and the policies say. And those are the words that I'm focused on. And I don't think there's any doubt that those words apply here. The argument is, is loss of use something that you can elbow in there. So could you address the asbestos or ammonia gas or noxious odors? Yeah, a couple things about that. I call those the contamination cases. I would start by focusing on the cases in Illinois, since we're addressing Illinois law. Those are essentially the asbestos cases. During earlier colloquies, there was discussion about travelers versus Elger. Absolutely, that's a general liability policy at issue and the duty to defend is at issue. One speaker for the policyholders went so far as to say basically it shouldn't apply at all because it's general liability. Well, all those asbestos cases, except for the Board of Ed case, are general liability cases. So I don't think our worthy opponents would want to suggest you should ignore all those cases. So let's drill down on Elger. Elger is looking at what physical injury or physical damage means, what physical loss means, I would posit. And that's where we get the language that everybody's quoting about a change in the physical nature, color, that type of thing. And that's law that this court has followed, albeit in a different context. It certainly wasn't in a COVID case. But those are important data points in order to lead us to the outcome of what direct physical loss or damage means in our policy. And does it mean that there has to be something tangible or structural? We maintain that it does. We maintain that travelers versus Elger supports that outcome. So an ammonia gas leak that denies use, is that physical loss? It has to be physical loss to property. And no, if it just denies use for a period of time. No coverage. No, there isn't. Because if you're just going to air the place out and it's good tomorrow, no, that's not direct physical loss or damage to that property. What's different about asbestos? What's different about asbestos is it's part of the structure, every bit as much as the joists and the sheet rock and the ceiling tiles and all the other construction materials that are in that structure. And the asbestos becomes friable, it breaks down and the fibers then move throughout the facility. But the asbestos is part of the building and it is the building that is causing the building to become ultimately uninhabitable. And that's the difference between asbestos and what we're dealing with here. And that's the difference that's been found in so many of the cases that we cite. One example I'd point you to would be the Steve Foley Cadillac case out of the Circuit Court of Cook County, which is an excellent analysis of how the asbestos cases simply should not apply here. So back to the business income coverage, which is different from the civil authority coverage. They're separately stated in separate places in the policy. It's important not to conflate them. The business income coverage requires direct physical loss or damage to the premises in order to get that coverage for the period of restoration, which ends when you repair, rebuild or replace the premises. Repair... You mentioned two things here. I didn't interrupt you. You mentioned two things, interruption by civil authority or some kind of physical damage to the property. And I'm wondering if you could talk a little bit more about what that means in terms of the physical damage to the building. I mean, when it comes to loss of income, loss of use, access, maybe other things that are insured separately. At least that's my understanding from your position. And if it's confined to physical damage to the building, the structure, whatever, and that causes some loss, whatever it is, maybe repair to the building, whatever it is. But that's where I'm funneled into. And I know we're getting into a lot of disease and all kinds of other things that sure cause loss of income. But loss of income, in my own view, really has to be something caused by damage or injury to the property. Is that different than your position? It is not, Your Honor. Again, we're looking at the 24 of T.C. ABC's own appendix. And the coverage that I think was parsed earlier by Judge Wood for business income requires direct physical loss or damage to property at the premises. And it's very important to keep those words in line. Property at the premises, I think an earlier speaker said, no, that said damage to the premises. There is a difference. I'd like to comment on the air for a minute. Okay. You're just about out of time, Mr. Litchfield. So I think you're going to have to wrap up. Would the court like me to comment on the issue about the air? Otherwise, I see that I am out of time. And I would just ask for an affirmance. I think that that's fine, unless my colleagues have questions. All right. Thank you very much. Anything further, Mr. Barnes? Yes, Your Honor. I want to make three brief points. The first is where we just ended off, is whether the coverage is limited to the building itself. And my friend just said, oh, it's limited to the physical structure. If you look at the language of the business income coverage, which is in A15 of our appendix, it says it pays for actual loss of business income sustained due to necessary suspension of operations at a premises caused by resulting from any covered cause of loss. The defendant didn't even raise this argument. And that's because, and it's not even in our appendix, premises is defined as the location of premises described in the declarations. In the declarations, the premises is described as the address, 4204 West Main Street, Belleville, Illinois. It is, I think, a little bit disingenuous for my friend to say that it doesn't cover property outside of the building itself. Because imagine if a bomb went off in the backyard of the restaurant that caused a big hole. Well, that wouldn't affect the building, but it would certainly be covered by the insurance coverage. The second thing I want to hit upon is my friend said that, look, physical really means tangible. No, it does not. Tangible and physical have different definitions. Tangible means capable of being touched and seen, perceptible to the eye. Perceptible means if it's microscopic, that can be physical. Something microscopic that's in the air, these micro droplets, are not tangible because you can't see them. You can touch them, but you don't really know you're touching them. But they are physical. And to suggest otherwise throws 150 years of science out the window. And then the third is the civil authority order, your honors. And Cincinnati said in its opening brief that the text of the orders controls. The governor of Illinois issued the declarations because his words, because of an occurrence of widespread and severe damage, injury, or loss of life or property. That is the end of the discussion for civil authority coverage, your honors. Governor Pritzker told us why. And when he asked questions in the previous, he said, well, it's on the face of the order. Why? You're exactly right. It is on the face of the order. And that's why we must prevail on civil authority coverage. And I think should also prevail on the general coverage, as we've said before. And I see that I'm out of time. All right. Well, thanks to all of you. We appreciate your help in navigating these cases. The court will take these three cases under advisement.